Good morning, everyone. Judge Cowan and I are pleased to be joined this morning by Judge Ditter from the United States District Court for the Eastern District of Pennsylvania. We welcome you, Judge. We heartily welcome you. Thanks for helping us out. We still have one vacancy on our court, and we just had a second one filled a few weeks ago. So without the help of not only our senior judges, but without the help of visiting judges from Philadelphia and elsewhere, it would be more difficult for us to handle our case load. And we're going to take advantage of Judge Ditter, too. That's exactly right. Okay, the first case on today's agenda is Race Tires America Inc v. Hoosier Racing. Mr. Decker. Good morning, Your Honors. Joseph Decker for Appellants Race Tires America with my colleague, Mark Shepard. We are before the court seeking reversal of the grant of summary judgment. The court should apply a de novo standard of review and draw all reasonable inferences in favor of Appellants Race Tires America. And I'd like to reserve two minutes for a rebuttal. That request will be granted. Your Honor, summary judgment shouldn't have been granted in this case. There are disputed issues of fact on each of the elements of each of the claims. Long-term duration contracts in this market, the dirt oval track race tire market, unreasonably restrained trade, the foreclosure rates, the number of races that are foreclosed from Race Tires America are extremely high. They're higher than the foreclosure rates that have been traditionally condemned in the case law. Didn't you actually pioneer this procedure yourself, though? And now you're vigorously attacking something which I understand was your innovation almost. Not exactly, Your Honor. In the 80s, Race Tires America came up with a concept of a single tire rule. That concept has been hijacked by the defendants and in essence turned into a device to pay sanctioning companies for long-term contracts that exclude thousands, exclude us from thousands and thousands of races. Back in the 80s, there wasn't even any money changing hands. It was a device to freeze in-season development for tires. One or two tracks, it was not anti-competitive and it lasted only for one season. This is a totally different animal, Your Honor. These long-term contracts that are now with sanctioning bodies that have a tremendous market power last for two, three, five, seven years and there is no justification for these contracts. The Hoosier Racing Tire has not justified the contracts and their duration at all. In fact, they've refused to give any justification. Well, the justification is that, you know, everyone is playing on a level playing field. Everyone is competing with the same equipment, so to speak, and therefore the best driver wins, not the man that's got the most money to get the most fancy up-to-date and new tires and equipment. But, Your Honor, that justification has no application to the duration of the contracts. That says nothing about the duration of the contracts. But what's the difference if the contract is one year or three years? Everyone's got an opportunity to bid on the contract. And that's sharply disputed in the record, Your Honor. We have been actually intentionally excluded from bidding on these contracts. The record is very clear on this. But as far as the justifications are concerned, your first point, there is no justification, no efficiency justification at all. And Hoosier has refused to give any to this Court for the long-term duration of the contracts. And the sanctioning companies, the sanctioning companies themselves, and this is in the record, they say, we don't have any reason to have a three-year contract, a one-year contract, or a five-year contract. Do they have to have a reason? Well, that's my point. They don't have to have a reason. And the fact is there is no efficiency justification that the sanctioning companies have to have for a long-term contract. Would two years be too long? Well, absolutely. Where does a contract become too long? The rational distinction is at a racing season, Your Honor. There can never be a justification for more than one racing season. Certainly not on this record. A racing season lasts from April to October. And keep in mind that the contracts are not with the consumers. So there is no efficiency justification. There is no justification that somebody has to maintain inventory. These are contracts with the gatekeepers to the consumers. The consumers themselves, this is in the material affidavit, the consumers themselves, they don't keep inventory for more than a couple of races. There is no justification to have five-year contracts. And let me tell you why. The seven-year contract with WSOTA that lasted from 2001 to 2007, you know why that ended up being seven years? Because Hoosier paid off a judgment that WSOTA had against it. There's no, and Judge Cowan, there's no parity justification for that. Well, yeah, but doesn't everyone have the opportunity to bid for business at the end of the time or whenever the time is to bid for the bidding process is made? Sharply, sharply disputed. Let me give you a couple of examples. First of all, Hoosier, in the whole time period from 2003 to 2009, identifies seven instances of bidding. The reality is. Where they weren't allowed to compete for the bidding process. Where there was bidding with more than one tire company. And four of those instances, Your Honor, happened after the lawsuit was filed. Four. And those were with their motorsports. The reality is that we are intentionally excluded from the market. Let's take the national sprint tire rule. This is a prime example. Hoosier used Dirt Motorsports to solicit its horizontal competitors to use Hoosier's form contracts that were automatically renewing and impose penalties for non-renewal to take out the entire sprint tire market. And as its reward, Dirt Motorsports gets $10 for every tire sold in its competitors' races. Did Dirt Motorsports approach us? Absolutely not. And, in fact, to the contrary. Does that go to the point fund? It can or it cannot. But Dirt Motorsports can use that money however they want. And that's clearly in the record. It helps the racers, does it not? Not directly. What happens is that the racers are charged monopoly prices. Some of that money can go to the point fund. There's no evidence in this record that Hoosier raised prices, is there? Yeah, absolutely. The evidence in the record is that by eliminating a low-cost provider like Race Tires America, that raises the prices of the consumers. I'll give you an example, Your Honor. The StormPay series, it's also called Great Racing USA. We're talking about this sanctioning body. Yes, which is a sanctioning body. No, we're talking about the sanctioning body it's defending here. Yeah. In DMS. In DMS, the evidence as far as tires are concerned is that any time we bid to DMS, and we were excluded for decades, after the lawsuit was filed, we get an invitation. We have by far, by far, the lowest tire price, $116. But that doesn't answer the question of whether Hoosiers, once they got an exclusive contract, raised prices. By eliminating a low-cost provider, Your Honor, that necessarily raises the prices of the consumers, and there's another dimension besides prices, and that's the duration of the tires. Let's go back to a very basic and fundamental issue that the district court fought. Where's your antitrust standing here? We have antitrust standing because we have been excluded from these races. We have been excluded for decades. We've been excluded for – Yeah, but you're a competitor. I think everybody will agree, vis-à-vis Hoosier and Goodyear, you are a competitor. That's correct, Your Honor. Okay. But the fact that you are excluded on this contract with CMS doesn't – or with DMS, doesn't mean that there has been harm to competition. We didn't even have the opportunity to bid any contracts for DMS before the lawsuit was filed, Your Honor. Well, but how does that have any effect on competition? Because we are eliminated for long periods of time for – Well, there's obviously been competition with DMS because currently Hoosiers doesn't have the contract. Goodyear got the contract. Did they not? That's in the record, and that – and also, there – we'd like some – when we – if this court reverses, that's – That sort of makes your opposition's case right there. Not if there's an agreement, Your Honor. Not if there's a market division to decide, well, Goodyear's going to get it this year, and for whatever contextual reason, perhaps because this court is considering the issue. Well, you could also be a consumer. You're just – Two classes of people have standing, consumers and competitors. Competitors, if they're excluded. And the evidence in this record is sharply disputed that we have been unable to even bid for these contracts. That's even assuming that the gatekeepers, which are conducting the bidding, are the consumers. They're not. But what procedures should be used for – as far as I can see from this record, everyone knows what's going on, and everyone – you say you're excluded from the bidding process. I thought everyone knew what's going on. It's sort of different than an open auction, but it is sort of an auction, as I understand, where you could bid like anyone else. How should the bidding go on? Far from it, Your Honor. If they want everyone to compete with the same type of tire or grade of tire, how should the bidding go on? Objective standards, allowing all tire companies, and there are three in this market, to compete. And that is – that's what's typically done, objective standards. Because there is nothing in the record to say that there can't be three tire companies out there competing. And the evidence is, Your Honor, that the tires perform virtually identically in the race. That's the parity point, Your Honor, and that's why there's no rationale. I say one year, Judge Ditter, because that's the maximum amount of time you can conceive of it. But the exclusive itself, the rationale for the exclusive itself is sharply disputed. Did you conceive of yourself as a consumer merely passing on the price to the ultimate consumer? I mean, is that a – is that the way you would view yourself? You mean the sanction companies, Your Honor? Yes. If there is a – the formula is high dollar volume. If high dollar volume goes to the sanction companies, then the price of the tire to the consumer has to be raised. And it's going through you, because you would raise the price, too. If that's – if it has in the past, there are some situations where it has in the past. But the point is that the consumers are not being – are not being included in the process. That's why there's not competition on the merits, and that's what the Aspen court requires. Well, I mean, can there be an immediate consumer and an ultimate consumer for antitrust standing? In this case, the – this is unlike the typical case where the exclusive contract is actually a deal with the person who's buying it. These consumers – these sanction companies don't even buy the tires, Your Honor. Well, obviously. Didn't your company bid on each of these five contracts? No, Your Honor. We absolutely did not. What prevented you from bidding on them? Number one – I don't – I do want to reserve my time, but number one, if you take the Dirt Motorsports contract. Before this lawsuit was filed, we inquired in 2002 – and this goes to your process point, Your Honor. We inquired in 2002. We sent a letter to Dirt Motorsports. Tell us when you were – how we can supply your racers. We get back a letter. Don't bother. We'll call you. Don't call us. We're perfectly happy with Hoosier. They've doubled our support. Don't send us any letters. We never hear from them. Not everybody knows what's going on. There's not perfect information on this by any means. There are e-mails back and forth between – Well, did you ever send them a letter and say, whatever Hoosier's price is, we'll give you a bigger – we'll give you a bigger fee? We – we – Promotional fee? We continue to press the point, Your Honor, if that's – if that's your question, and that is absolutely true. We continue to press the point. In fact, we would – Let me make another point, just since you only have a minute here. Yeah, and I'd like to reserve two minutes for rebuttal. We already reserved two minutes, Your Honor. Okay, thank you, Your Honor. You only have a minute. Let's assume that the district court was wrong on antitrust – on the antitrust stand. How do you show a section – a Section 1 violation? The unreasonableness of the duration of the contracts. Every contract is evaluated under Section 1. Yes, but doesn't it have to have an adverse impact on competition? Yes, it does. And how do you show that? And – and the – the example that I was – that I'd like to give you is the storm pay example. We're – both – both tire competitors are in this – are supplying the racers in the sanctioning group. Our price is $125. The Hoosier price is $175. Hoosier does a deal with the sanctioning body, switches them, going over – and the racers – 40 percent of the racers are on our tires. Switches them over to all – all Hoosier. Now every racer pays $175, gets a less durable tire, more money out the door by the racers. That's the anti-competitive effect, Your Honor. And I would point out, because of the conceded monopoly power, anti-competitive effects are presumed in this case. Now – but they don't have to be presumed because we've got them in the record, Your Honor. Okay. We'll have you back on rebuttal. Thank you, Your Honor. Mr. Kniebel? Yes, thank you. May it please the Court, Don Kniebel representing Hoosier Tire. I think it's obvious from the questions what Mr. Decker wants. He wants to turn the courts into the Czars of Racing. He wants to establish objective criteria. He wants to establish duration of contracts. Who's going to determine that? Well, he doesn't want to be excluded from bidding for business. What's wrong with that? Well, that's okay, but he hasn't been excluded by anything that Hoosier has done. The Santana case is a perfect example of that. This Court decided – Santana alleged that there were dirty tricks being pulled by the defendant that kept it from bidding. And the Court said there was no coercion going on that prevented the plaintiff from bidding. Because there was no coercive activity by the defendant, the plaintiff lost summary judgment. That was this Court's Santana case. Despite dirty tricks, despite fraud, the Court said nothing the defendant did coerced the buyer into buying only from the defendant. Well, if it's coercion or not, isn't it anticompetitive that someone wants to bid on a contract and through some sort of machinations is unable to be heard in what they want to offer? If there's an agreement to that effect, one of the things they point to, they say Well, it's not going to be a written agreement, but the way the system works, he says, there's nothing in writing you can't pull out a contract or anything that he's excluded from offering a lower price. Well, I think the Court's question was perceptive. It was also the District Court's question. Did you ever offer a lower price than Hoosier? The answer to that question was no. They say, Well, USAC wouldn't answer our phone calls. Well, USAC's not a defendant here. There's no evidence that Hoosier caused USAC to not answer the phone call. They say WSSOTA told us that they were interested in a lower tire price, but in fact they were interested in a higher point fund. No evidence that Hoosier had anything to do with that, and WSSOTA's not here. The antitrust laws aren't codes of business etiquette. The only thing the antitrust laws look to are coercion, express agreements. The fact that USAC didn't answer a phone call and kept them from bidding doesn't mean they couldn't send in a letter. The District Court asked the very question, Did you ever offer in these various situations to offer lower prices or provide higher point funds than Hoosier did? And the answer was no. They bid on the WSSOTA contract. That's in the evidence. They said later they could have got the business, but the management said they were not going to bid any lower to get the business because they put a floor on the price. They bid on the IMCA business. They wouldn't provide the price information that IMCA requested. Cost information, didn't get that job. DIRT, the defendant, requested an exclusive proposal. They didn't make an exclusive proposal, didn't get that one. They bid to USAC, didn't get that one. So yes, in fact, Your Honor, the answer to the question is, Did you bid on every one of these contracts? The answer should have been yes. You refer to coercion, and the District Court did in its opinion. Yes. But is coercion a necessary element in a restraint of trade? Well, Your Honor, we look at it. It is a necessary element in the context of an exclusive dealing because every day in our economy people make exclusive agreements. The fillies decide that there's a soft drink, an exclusive soft drink at the games. They go with Coca-Cola. They go with Coca-Cola. We have an objective test to decide if it's better than Pepsi. They pay money for that. So long as the customer decides that's what they want to do, that's what our economy does every day. Now, if Coke had gone in and said, We won't sell to you forever unless you give us an exclusive this year, and everybody wanted Coke, that would be coercion. But in our economy every day people make a supplier. I'm sure this Court has a favorite vendor for its computers. But that's a boycott situation as opposed to a restraint of trade situation. My point is I'm not sure that coercion is necessary. There has to be something beyond two people agreeing. Isn't it concerted action with an adverse impact? I think our view is that if the fillies decide that they want to have Coca-Cola to be the exclusive supplier, if the Major League Baseball decides it wants to have only wooden bats, they have the right to make that choice as long as somebody hasn't come to them and say, You have to do it our way or else. Those are circumstances here I took off from the briefing. Hoosiers market increased, I think it's, let's see, during 2007 to 79% of the dirt track business, and SDA's own business plummeted during the same period. The general, and 94% of the dirt car business was yours. I mean, don't these sort of speak some sort of market dominance through these long-term contracts? Well, Your Honor, here's the problem with this. Let's suppose the sanctioning bodies come to Hoosier and say, We want you to bid on being exclusive, and they already have 75% of the business. Are they supposed to say we can't bid? That's the only alternative because if they bid and they win, they get more business. The sanctioning bodies are picking them. The only solution to the problem that Mr. Decker points out is that Hoosier would have to say, Sorry, we can't bid because we're already too big. Now, we deny that there's any monopoly here, but we don't want to contest it because we think it's not relevant. One thing Mr. Decker points out is by his client being excluded, if they were offering a lower price on tires, therefore the drivers and the owners would not be getting the opportunity to buy a lower-priced tire. They'd be forced to buy a higher-priced Hoosier tire, notwithstanding the fact that Hoosier paid promotional fees to the sanctioning body. Doesn't that have, in and of itself, an adverse impact on competition? Well, if the sanctioning bodies have made the wrong choice, they're going to go out of business because the drivers won't come to their races and they'll go out of business. Yeah, but isn't there a point at which I know you'll say and you argue that they might go out of business because the drivers can vote with their feet and they can move to another track, they can go elsewhere, but doesn't the market share get so large that the market power, per se, makes it anti-competitive? Well, you're right, but I'm back to the dilemma, which is let's suppose that the answer to that is yes. And the sanctioning bodies that like Hoosier tires, obviously, like to deal with Hoosier, come to Hoosier and say, we want you to bid on being exclusive for the next season. What is Hoosier supposed to say? Our market share is too big, we can't bid? And then we're going to subject the sanctioning bodies to a lawsuit if they manage to pick the one that some jury later decides has too high of a market share? We don't think there's a market for dirt-tack tires. That brings into question the entire process of what specific pro-competitive, pro-sports or business justification exists for this arrangement in the first place. You're talking about the arrangement where the sanctioning bodies go out and sell exclusive? Yeah, I mean, the whole thing, I've never seen anything, I'm not into racing cars, of course, but I've never seen anything quite as convoluted as this entire process. Judge Cowen races boats. I race boats. And with the boat racing, they say you must have this type of boat, this sale, and they designate exactly everything you have to have, the sanctioning body. Incidentally, the sanctioning body doesn't get any money for this. We don't collect any money. You don't have to pay the committee boat to get designated as the official sale and so forth, which is also a little unusual here. The sanctioning body is getting money from the suppliers, the tire suppliers, and it seems very peculiar to me. So I'm acquainted with requiring everyone to compete on the same level playing field, but the difference is in the boat racing thing, they designate the boat, the sale, and you can't deviate from that. Nor does the race committee get any money on the side. It's not on the side. Everything is up front here. It's on the table. But that brings into question what is the competitive pro-sport benefit, the business justification, I guess I should say, this entire convoluted process. Your Honor, what's happened is that the entire economy has figured out that exclusivity has value and can be sold. The Phillies have determined that having an exclusive Coke supply is something that they can get money for. And so Coca-Cola will pay money to the Phillies to be able to say we're the exclusive supplier, and then they charge the consumers the soft drink. The competition exists at the point where there's competition for that contract. Judge Easterbrook said competition for that exclusive contract is the competition. So your position is they should come in and offer the sanctioning body more money with a tire or whatever they're offering. We have a word for that. It's called competition. You come in, and by the way, the sanctioning bodies are looking at two numbers. The record is clear on that. They're looking at the price of the tire for their driver. They're looking at the sanctioning money because if they get out of balance, then they go out of business. If they charge the drivers too high a price for tire, and they don't have enough point fund money, drivers will go somewhere else. So, yes, the answer would be they should come in. Is there any evidence in the record that drivers have gone elsewhere because of dissatisfaction with points and the funds and prices of tires? No, there's zero evidence of that. In fact, remember, all the amicus briefs are sanctioning bodies who say this is a good system for us, and if the drivers didn't like this system, they would leave us. There's zero evidence that the drivers have left because of the tire price and don't go to a particular sanctioning body. They like the prize money. That's what they race for. And so they may be willing to pay a higher price for a tire in exchange for the higher prize money. And who makes that judgment? The sanctioning bodies do that. The tire companies put in two numbers in their proposals. They put in a tire price and a point fund price, and the sanctioning bodies look at both those numbers. In fact, with respect to WSOTA, the complaint is, well, we thought WSOTA wanted a lower tire price. What they really wanted was a higher point fund price. Well, when you charge a higher point fund amount, by definition, you have to raise the price. That's how it works. But the sanctioning bodies are in the business of making that judgment. Mr. Decker and his client want the courts to make those judgments. Here's what they say they want in their reply brief. They want the sanctioning bodies to, quote, set objective tire criteria, decline a financial stake in rules decision, and allow multiple suppliers to supply to an objective specification. Well, yeah, they want a less restrictive alternative. What is wrong with that? Well, who's going to impose this on these sanctioning bodies who aren't here, and why shouldn't the sanctioning bodies be in the best position to determine what's good for their business as opposed to some jury somewhere that will make judgments based on something other than what the sanctioning bodies are doing? Well, they're not here, but they may be part of the, I mean, you could theorize that they're part of the conspiracy confederation agreement in restraint of trade. Well, then, you could argue that the entire economy now, which is giving exclusive deals in exchange for money, such as the Phillies getting money for selling Toca-Cola, that they're all in a grand conspiracy. But the proposition that we're asserting is if the sanctioning body decides that it's in the best interest of their business to have exclusivity, and they're not coerced into that by the tire suppliers, that's the end of the inquiry, because the only alternative to that is to say that companies such as Hoosier can't bid or to impose the federal court system as ours of racing to monitor the outcomes of this. Well, the alternative is the limited compound competitive rule. Well, yes, but that's not exactly what the plaintiffs say they want, because they say that single-tire rules are okay if they win. They say, I'm sorry. They have said in their briefing that single-tire rules are okay if the selection is a. . . But Mr. Decker did direct us to the fact that duration. Yes. Had a major impact. So they didn't quite say it's okay if they win. They're saying here that single-tire rules are okay so long as they're not too long. Well, who's to determine too long? If the sanctioning bodies have decided, well, in some cases it's three. . . Isn't an increase in market share a good way to make a determination as to whether it's too long? Well, I wouldn't think that would be right, because the sanctioning bodies all could have one-year contracts and Hoosier could have all the business. So the only way to take market share into account is to say Hoosier can't bid. If market share becomes the test when a sanctioning body wants exclusivity, the only thing that Hoosier can now do if the plaintiff is right about its market share is to refuse to bid the next time. That's the only way, and that can't be competition. It cannot be rational to say that you solve an antitrust problem by creating less competition. Are there sanctioning bodies in addition to those that we have in this case? How many sanctioning bodies are there in the United States? Oh, many, many, many, many. The ones that have been identified in this case are the largest of the sanctioning bodies. Only one is before the court. Remember, we have NASCAR, we have USAC, but there are a lot of local sanctioning bodies, many, many, many. I do not know the exact count, but it's many, many, many. Thank you. Thank you, Mr. Kniebel. We'll hear from Mr. Jobes on behalf of Dirt Motorsports. Good morning. I'm Theodore Jobes of Fox Rothschild. I represent Appellee and Defendant Below Dirt Motorsports. Dirt Motorsports joins in the arguments advanced by Hoosier and the amicus brief of the other major sanctioning bodies, including NASCAR. I have limited time to speak from the sanctioning body perspective. The sanctioning body is an organization that formulates and promulgates rules that govern the races which they sanction. Sanctioning bodies typically have rules governing the cars and equipment which are permitted to run in a particular race. Among these rules are single tire rules, which require that a specific tire and brand be used in one or more wheel positions. As the district court correctly found, a sanctioning body determines what tire rules to run for its various races and makes this decision based on its own self-interest, including how to best market its races. The sanctioning body may decide if it wants a single tire rule for all or most categories of races it sanctions. Significantly, this finding is not disputed by RTA. Tires are not the only components of a race car subject to single source or manufacturer rules. Sanctioning bodies make rules that may specify, for example, carburetors, mufflers, even the entire chassis. No finding concerning a sanctioning body's justification for single tire rules is required to affirm the district court's judgment, where, as here, the sanctioning body's one exclusivity... Mr. Jobes, doesn't this exclusive tire arrangement really benefit the sanctioning bodies to the detriment of the consumer in that the more you get back in promotional fees, the more clout you have in the business? Because everybody's trying to race for points, and the more money in the point fund, the more there is. I mean, doesn't all this benefit you? And isn't it, to some degree, at least anti-competitive as to the purchaser of the tire if, in fact, there's a differential between $125 and $175 per tire? Well, but it benefits the racers if, in that particular instance, the sanctioning body is paid a higher points fee or points fund. It benefits the racers because they can then win prize money. Would you be paying $50 a tire? And he can win a higher pot than if he had the lower-priced tire with less points fund. That's a competitive decision. The sanctioning body may want to go with a lower-cost tire and have a smaller point fund, or they may want to go with a higher-priced tire and have a higher point fund. Well, some of the money goes to the sanctioning body itself. That's going to all get passed on to the winner. Well, but that's true in any instance. It's no different than if the NRA … Well, who controls how much is going to go to the prevailing winner and how much goes into the pockets of the authority that's running the race? The sanctioning bodies decide that, but if they make the decision incorrectly over time, they'll lose racers to other sanctioning bodies. Racers will vote with their feet, as Judge Fischer said earlier. And so it's an economic decision, and it's one that should be left to the sanctioning bodies. If they make it wrong over time, market forces will reward the competitors who do it differently. Well, in other words, we should allow the sanctioning body to determine how much they're going to rake off of their own pockets and how much they're going to pass on to the racers. It happens all the time in the economy. It's no different than the Phillies getting a fee from Coca-Cola to supply beverages or from a particular manufacturer to be the official hat manufacturer for souvenir hats. But the most fundamental part of your argument is, yes, you're doing this, but anyone else could do it as well. No, no. There are many pro-competitive justifications for it, which we cite in our brief, such as promoting parity, reducing cost to racers, promoting safety, increasing the number of racers or car counts, increasing the number of fans, ensuring a consistent and reliable source, et cetera. But basically you're saying that anyone can make the same bid, bid more than you, and get a contract. But that happens in business all the time. It's no different than if you talk about sailing as an example. If you have an America's Cup race, I'm sure that they have Rolex or someone is the official sponsor of the America's Cup race. They're paying money to get that spot. It happens in our commerce all the time. Okay, Mr. Gibbs, thank you. Thank you. I understand your position. And we'll have Mr. Decker back for rebuttal. Thank you, Your Honors. When you go to a race and it's sponsored by Rolex, not all the fans have to wear a Rolex watch. The argument that we are hearing is that simply the courts should leave us alone and let us make these decisions. The courts, and we hear the term the czar, the czars of racing. The courts are czars of a lot of different areas. They simply apply the law. They're czars of the workplace. They're czars of patent infringements. There's no difference here. The argument is just simply leave us alone. I want to say that it's pure sophistry to argue this Phillies Coca-Cola deal because there's no restraint in that market. Coca-Cola, if the Phillies choose Coca-Cola, Pepsi can serve Pepsi at about 1,000 different places within a mile radius of the stadium. Yeah, but you don't have 45,000 people at Citizens Bank Park coming in every day to buy Pepsi if Coca-Cola has an exclusive contract. But that's true, but that as a total amount of Pepsi is not a significant restraint. Here, this is the only place we can sell these tires. We can't sell them at Sears. We can't sell them for off the road. They can only be used at the dirt tracks. And who has the key to the dirt tracks? And that's the sanction companies. Okay, so you're making an argument that you're harmed. And that is the exclusive effect. That you're harmed as a competitor. Let's go back to one of my original questions. The antitrust laws are intended to protect competition. That's correct. Competition is different than the competitor. I completely agree, Your Honor. But here there are. I just don't see how your argument shows that competition has been harmed here. And that is because even for the sanctioning company contracts themselves, we've been excluded. There has not been competition. Even if you assume that the sanctioning companies are, in fact, consumers, which they're not. Your opposition, you know, recited a number of sponsoring bodies, sanctioning bodies for which you made bids. That sounds like competition. He didn't get that specific, I didn't think. And we get very specific in our brief. Let's just talk about the National Sprint Tire. No competition there. We weren't invited. USAC in 2007, they want to change their tire rule. We asked to go to the meeting. Not invited. ASCS, we asked to match Hoosier's bid. We're blocked. Why are we blocked by? The contracts. Correct me if I'm wrong. The only sanctioning body that's a defendant in this case is DMS. That's correct. How can you make an antitrust claim against Hoosier because a sanctioning body didn't give you a chance to bid? Hoosier has the contracts with the sanctioning bodies. Hoosier is the hub and the spokes go out to the sanctioning bodies. Hoosier has some, but other sanctioning bodies have contracts with others. Example, DMS has a contract currently with Goodyear. The foreclosure rates in this market from these contracts are high, and DMS has a contract with Goodyear, that's going to be a subject of inquiry because if the contract is the result of an agreement in a market division, that could be a problem also. But that's not in the record, Your Honor. I want to say the argument that you heard, that the sanctioning company will go out of business, that's the classic monopolist argument. If the only check on a monopolist's power is that nobody's going to buy my products, that means that there's no other competitors out there that are enforcing a check. And the way this market is going, and Judge Cowley, you have the figures in front of you as to the market shares. RTA is going to be out of this business, and we're not going to be a check. And the racers are going to not be able to vote with their feet because the number of competitors in this market are dwindling. They've dwindled over the last ten years. The market shares of the monopolist have increased, and everybody else has been cut severely. Okay, Mr. Decker. I have one question. How many sanctioning bodies are there in the United States? There are, I will give you a number of approximately 100 that we've researched. I don't think this is in the record. But the major ones are the ones that we're talking about here, and that's where you get the high foreclosure rates of 40, 50, and higher percentage, far higher than that's been contended in case law. 195 that we're not concerned with here. But they're very small. In other words, they might sanction two or three races a year. Here we're talking about thousands of races a year. Are you talking 100 sanctioning bodies involving dirt tracks? Yes. But, as I said, they might sanction one race a year or two or three. The ones that we're talking about in this action are the ones that sanction upwards of 10,000 races a year, Your Honor. Okay. All right, Mr. Decker. Thank you very much. Thank you, Your Honor. Thank counsel for helpful and excellent arguments, and we'll take the matter under advisement. Thank you, Your Honors.